**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MAINE**

| | | |
|---|---|---|
| KATHLEEN DUNN | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Docket No. 07-140-P-S |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**FINDINGS OF FACT & CONCLUSIONS OF LAW**

This matter came before the Court for a bench trial, which was held on May 29 and 30, 2008. Plaintiff Kathleen Dunn asserted a claim under the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680, to recover for alleged negligence by the Brunswick Naval Air Station Commissary on November 25, 2002. At the close of trial, the Court ordered the parties to submit proposed findings of fact and conclusions of law. The parties filed their proposals on July 3, 2008 (Docket #s 28 & 29).

In accordance with Federal Rule of Civil Procedure 52(a) and having reviewed the parties' post-trial submissions as well as the entire record, the Court now makes the following findings of fact and conclusions of law:

**I.   FINDINGS OF FACT**

Kathleen Dunn is a citizen of the United States and a resident of Brunswick, Maine. Mrs. Dunn began working for the Navy as a cashier at the Brunswick Naval Air Station's Commissary ("the Commissary") in 1991. This action arose out of a slip and fall that occurred at the Commissary in 2002. Although the cause of action accrued in 2002, it is necessary to consider a

1

limited time period prior to the 2002 slip and fall, beginning with a slip and fall that occurred during the 1998 ice storm.

**A.      January 1998 Ice Storm Slip and Fall**

On January 8, 1998, during the ice storm, Mrs. Dunn slipped and fell on ice on the ramp to her office and was injured. The January 1998 slip and fall was considered an on-the-job injury. The treatment for the January 1998 slip and fall included a Magnetic Resonance Imaging ("MRI") that revealed no disc herniation. By March of 1998, Mrs. Dunn was released by her doctor to return to her full time job with the Navy.

**B.      July 1998 Automobile Accident and Chronic Back Pain**

In July of 1998, Mrs. Dunn was in an automobile accident where her vehicle was rear-ended by another vehicle that was traveling at 35 to 40 miles per hour. The accident caused Mrs. Dunn to experience chronic neck and back pain. On April 1, 1999, May 27, 1999, August 19, 1999, December 9, 1999, March 2, 2000, April 13, 2000 and October 30, 2000, Dr. Donald Kalvoda, an adult and pediatric orthopaedic surgeon, treated Mrs. Dunn for chronic back pain. On December 18, 2000, Mrs. Dunn cancelled her appointment with Dr. Kalvoda; based on medical records, it does not appear that Mrs. Dunn treated with Dr. Kalvoda again. At trial, Mrs. Dunn did not remember much about the July 1998 automobile accident.

**C.      Treatment with Dr. File**

On October 18, 2000, Mrs. Dunn treated with Dr. Peter File, a doctor of osteopathic medicine, for the first time. During the visit, Mrs. Dunn reported "multiple areas of pain, especially in the low back and hip, with pain into the knees and up into the shoulders and neck," resulting from the January 1998 slip and fall. (Def.'s Ex. 11 at 20.) Dr. File diagnosed Mrs. Dunn with "somatic dysfunctions: cervical, thoracic, lumbar, sacral, hips, lower extremity, ribs."

(Id.) At this visit, Mrs. Dunn rated her pain between 8 and 10 on a scale of 1 to 10. Dr. File noted that the 1998 MRI showed no disc herniation, but that the results of a more recent MRI were not yet available. Dr. File ascribed Mrs. Dunn's muscle tightness to her 1998 slip and fall. The 1998 automobile accident is not mentioned in Dr. File's consultation report.

On October 17, 2000, Mrs. Dunn was examined with MRI that revealed minimal spinal stenosis at L4-L5 created by a mild bulge that was "probably of little clinical significance." (Id. at 22.) On October 26, 2000 and November 1, 2000, Dr. File treated Mrs. Dunn for muscle tightness, tenderness and pain in various locations.

**D.     Dr. Klein's Neurology Treatment in November 2000**

On November 22, 2000, Mrs. Dunn was seen by her neurologist, Dr. Klein. Her complaints at the time were low back pain and bilateral leg pain. On November 23, 3000, Dr. Klein wrote a detailed report of his findings. Dr. Klein mentioned the 1998 slip and fall but not the 1998 automobile accident. Dr. Klein noted that following the 1998 slip and fall, there was a question as to whether Mrs. Dunn had sustained a fracture at L4-L5, but the "subsequent workup reveals no evidence of fracture." (Def.'s Ex. 11 at 25.)

With respect to the more recent MRI, Dr. Klein noted:

> It shows a small lateralized bulge on the L4-5 disc somewhat worse on the left side. There is no significant clinical impression of mass effect on the thecal sac at this level. No other abnormalities are identified. Although the radiologist describes 'minimal spinal stenosis at L4-5,' in my view it is not clinically significant. . . . There is a signal loss at L4-5 consistent with early degenerative disc disease although the disc height is otherwise well maintained.

(Id. at 26.) According to Dr. Klein, Mrs. Dunn's "complaints would appear to be somewhat out of proportion for the findings of the MRI scan." (Id. at 27.)

On December 5, 2000, Dr. Klein followed up with Mrs. Dunn and noted that "her MRI scan of 10/16/00 looked quite benign except for a slight bulge at L4-5 which could not possibly

cause her bowel or bladder complaints." (Id. at 29.) Dr. Klein also noted that "she walks as though she were uncomfortable in spite of telling me she is better." (Id.)

On December 7, 2000, another MRI confirmed a bar-like disc bulge and minor protrusion at the L4-5 level, but there was no evidence of nerve root compression.

**E.     Dr. File's 2001-2002 Treatment**

On January 8, 2001, Dr. File treated Mrs. Dunn and reported that the pain in her low back, hips, shoulders and knee was improving and that surgery was not indicated. On February 7, 2001, Mrs. Dunn reported to Dr. File that she was doing reasonably well, better than before, but that she still felt discomfort at a tolerable level in her low back and hips. On May 1, 2001, Dr. File treated Mrs. Dunn for pain in her low back, hips, shoulders, knees and neck, which Mrs. Dunn attributed to "extra stress at home" and "ergonomic changes at work." (Def.'s Ex. 11 at 40.) On May 1, 2001, Mrs. Dunn rated her pain as a 5 out of 10. For the remainder of 2001 and into early 2002, Mrs. Dunn continued to seek medical care for a variety of complaints including: esophagitis, gastroenteritis, miscellaneous digestive disease, chest pains and ongoing pain throughout her body.

On February 13, 2002, Mrs. Dunn reported that she was experiencing pain at a level 7 out of 10, with indications of pain in numerous parts of her body. On April 3, 2002, May 8, 2002, August 6, 2002 and August 14, 2002, Mrs. Dunn reported to Dr. File that she was continuing to experience pain virtually everywhere in her body. On August 27, 2002, Mrs. Dunn reported pain to Dr. File at a level 9 out of 10, one level below agony, with indications of pain in almost every location of her body. On September 4 and September 30 of 2002, Mrs. Dunn again reported to Dr. File that she was continuing to experience pain in almost every location of her body.

4

**F.     The 2002 Slip and Fall**

On November 25, 2002, while shopping at the Commissary and speaking with another customer, Mrs. Dunn slipped and fell in a puddle of water in the produce section, which was left by a Commissary employee after having watered the vegetables. When Mrs. Dunn fell, she felt wetness on her undergarments. She stated that it felt like she had "peed on [her]self" and that "[her] back end was wet." (Day 1 Tr. (Docket # 24) 88.) After falling, Mrs. Dunn observed that there was a whole area of water in a circle around her. The water was not deep but there was a puddle of water. Mrs. Dunn does not recall seeing the water prior to her fall. At the time, she was wearing dress boots with a heel and denim blue jeans.

By late 2002, Mrs. Dunn had worked for the Navy at the Commissary for approximately eleven years. She was familiar with the Commissary and shopped there often. Although Mrs. Dunn was employed at the Commissary, she was not on duty at the time of the accident. In the years leading up to the 2002 slip and fall, Mrs. Dunn did not see water on the floor of the Commissary. She was familiar with how the Commissary sprayed the produce with water. To spray the produce, a Commissary employee had to pump the sprayer and then walk down the line and spray the produce. Nonetheless, Mrs. Dunn generally did not pay attention to whether there was water on the floor.

Immediately after the slip and fall, Mrs. Dunn experienced pain. She picked herself up from the floor using the edge of the produce stand and proceeded to the office of Bill Jones, Produce Manager, to inform him that there was water on the floor and that she had fallen and hurt herself. Mrs. Dunn had trouble walking almost immediately; she held the sides of the produce stands as she made her way across the produce department to Mr. Jones' office.

Upon arriving at Mr. Jones' office, Mrs. Dunn informed him that there was water on the floor. He told her that he would attend to the water. He did not ask Mrs. Dunn if she had been hurt, nor did he immediately attend to the water on the floor.

After leaving Mr. Jones' office, Mrs. Dunn proceeded to the I.D. desk at the front of the store where she called Barbara Quill, her direct supervisor. Mrs. Dunn requested that Ms. Quill come out and see her because she felt that Mr. Jones had not paid attention to what she had said regarding the water. Mrs. Dunn spoke with Ms. Quill at approximately 4:45 p.m.

Ms. Quill responded to Mrs. Dunn's request and, when she arrived at the I.D. desk, asked if Mrs. Dunn was "alright." (Pl.'s Ex. 6(e).) Ms. Quill then went to Mr. Jones' office and asked if he knew that Mrs. Dunn had fallen. He indicated that he was not aware. Ms. Quill and Mr. Jones went to the produce section of the Commissary and cleaned the remaining water from the floor. Upon seeing the water, Mr. Jones determined that the water on the floor was the result of an employee who had watered the vegetables. There were no mats on the floor in the area where the water was on the floor, nor were there any signs to alert customers to the wet floor. After the incident, Mr. Jones made a poster calling to the attention of all produce personnel the importance of not leaving water on the floor after watering the vegetables, and if the floor did become wet, to post the area with a sign until the floor was dry.

Ms. Quill went back to check on Mrs. Dunn. Mrs. Dunn stated that she was in pain and that she wanted to go home and lay down. Ms. Quill asked whether Mrs. Dunn wanted to see a doctor, but Mrs. Dunn stated that she wanted to go home. Mrs. Dunn drove herself home, took pain medication and laid down. That night, Mrs. Dunn was in "a lot of pain" and was unable to sleep. (Day 1 Tr. (Docket # 24) 20.) Mrs. Dunn did not see a doctor on November 25, 2002.

6

**G.     The Week Following the Slip and Fall**

Mrs. Dunn worked the following day, Tuesday, November 26, 2002. On Wednesday, November 27, 2002, the pain prevented Mrs. Dunn from moving and getting out of bed, so she stayed home from work that day. Thursday, November 28th was Thanksgiving. Thanksgiving and that Friday were paid days off for Mrs. Dunn. Over the Thanksgiving holiday, Mrs. Dunn was unable to function normally; she could not cook the holiday dinner or visit with guests due to the pain that she experienced.

Mrs. Dunn returned to work the Saturday following Thanksgiving, but she remained in pain. At work, she made accommodations for the pain, such as limiting her intake of food and water so that she would not have to travel to the restroom and propping her legs on a waste basket. Monday December 2, 2002, was Mrs. Dunn's regular day off. For the rest of the week, December 3 through 7, Mrs. Dunn worked full work days.

**H.     Medical Treatment Following the 2002 Slip and Fall**

On December 9, 2002, Mrs. Dunn was seen at the Brunswick Primary Care Clinic by Dr. Pruss, her primary care physician. He stated that "Kathleen Dunn is a patient in my care. She has recently experienced a significant worsening in her pain symptoms following a fall at work. This exacerbation is likely transient and will be much improved by some rest." (Def.'s Ex. 11 at 103.) Dr. Pruss determined that Mrs. Dunn should take medical leave from work for three days, December 10, 11 and 12, 2002.

Mrs. Dunn worked on December 13 and 14. On December 16, 2002, she presented to Dr. File. During that visit, Mrs. Dunn reported fewer locations of pain than she had on September 4, 2002, her last visit with Dr. File before the slip and fall. On December 16, she reported a pain level of 10 out of 10. In comparison, Mrs. Dunn reported a pain level of 9 out of 10 on August

27, 2002. Dr. File took Mrs. Dunn out of work until December 21 due to her acute low back pain.

On December 19, Mrs. Dunn treated with Dr. Manahan, an associate of Dr. File. Her report of the locations of pain did not include the knee, leg or ankle pain that Mrs. Dunn had reported prior to the November 25, 2002 slip and fall. Also at that visit, Mrs. Dunn complained of carpal tunnel as a new problem. At trial, Dr. File opined that the slip and fall could have been a factor in the new complaint of carpal tunnel.[1] Dr. Manahan extended Mrs. Dunn's medically necessary work leave until January 8, 2003. Mrs. Dunn had no office visits between December 19 and January 6, 2003.

On January 6, 2003, Dr. Manahan concluded that Mrs. Dunn still had no work capacity. Mrs. Dunn's self-report of her pain did not include carpal tunnel pain, but it did include a report of leg pain that was not identified at the December 19 visit. Mrs. Dunn reported more locations of pain during this visit than the previous visit; for example, Mrs. Dunn's December 19 report of wrist pain is no longer indicated, but there appear to be new indications of pain in the abdomen. At trial, Dr. File indicated that "the pain is shifting around," but there are no contemporaneous medical notes to that effect.[2] (Day 2 Tr. (Docket # 25) 243.)

On January 13, 2003, Mrs. Dunn was treated by a neurologist, Dr. Daniel Bobker. Dr. Bobker noted that Mrs. Dunn "does not have neck pain, neck injury or distal numbness," although her history includes chronic low back pain. (Def.'s Ex. 11 at 114.) He concluded that

---

[1] He also indicated that overuse at work was a contributing factor to the carpal tunnel pain, but Mrs. Dunn had not been at work during the days immediately prior to the December 19 examination.

[2] At this point in Defendant's Proposed Findings of Fact and Conclusions of Law, Defendant submits various statements regarding a FMLA leave request by Plaintiff to care for her father. The Court does not consider the FMLA request relevant to the questions before the Court.

Mrs. Dunn's carpal tunnel syndrome was very mild, "just barely in the abnormal range," and it "certainly does not warrant a carpal tunnel release." (Id. at 115.)

On January 14, Dr. File extended Mrs. Dunn's medical leave from work until January 21, 2003 because she still had no work capacity. At this visit, Mrs. Dunn reported pain almost everywhere in her body but not in her abdomen. She specifically noted carpal tunnel as a new problem, that she could not walk long distances and that her feet were "really sore." (Id. at 119.) Mrs. Dunn reported her pain level at 9 out of 10.

### I.     Return to Work

Mrs. Dunn returned to work after January 21, 2003. For the next three months, Mrs. Dunn worked despite the constant pain because she was concerned that she would run out of leave and believed that "she had to do what she had to do." (Day 1 Tr. (Docket # 24) 26-27.) She continued to treat with Dr. File.

On February 3, 2003, Mrs. Dunn self-reported her pain level at 8 out of 10 and included locations of pain in virtually every spot on her body. Mrs. Dunn stated that she had difficulty walking long distances, but Dr. File observed that her gait was normal. On February 17, 2003, Mrs. Dunn treated with Dr. File. She self-reported a pain level of 8 out of 10; she indicated pain in numerous parts of her body, including her neck, front shoulders, hips, elbows, wrists and ankles. On March 3, 2002, Mrs. Dunn treated with Dr. File and reported pain levels ranging from 4 to 8 out of 10. She reported pain in her shoulder blades, low back and front thighs but did not report pain in her neck, front shoulders, hips, elbows, wrists or ankles. On March 17 and 31, 2003, Mrs. Dunn reported pain in almost every location on her body. From January 27, 2003 through March 31, 2003, Dr. File did not impose any medical restrictions on Mrs. Dunn's ability to work.

9

After Mrs. Dunn's 2002 slip and fall, she reported pain levels of 8 out of 10, which were in a similar range to Mrs. Dunn's pre-slip and fall reports of pain.  When asked to explain, Dr. File testified that "pain is a subjective thing" and that he looks for "the pain level changing" and tightness in the muscles.  (Day 2 Tr. (Docket # 25) 204.)

Mrs. Dunn worked full time in February and March of 2003.  On April 1, 2003, Dr. File wrote a letter to confirm Mrs. Dunn's work capacity and limited Mrs. Dunn to working from 7:30 a.m. to 4:00 p.m.  Dr. File indicated that prior to April 1, 2003, Mrs. Dunn was working more than full time.  When asked why he released Mrs. Dunn to work full and over time prior to April 1, 2003, Dr. File testified that, like Dr. Pruss, he thought he could return Mrs. Dunn to normal functioning and activity.

Toward the end of April 2003, Mrs. Dunn presented at local emergency rooms three times over a four day period with intense back spasms.  On April 23, 2003, Mrs. Dunn was admitted to Mercy Hospital with chronic back pain that Mrs. Dunn described as a "charley horse" sensation in the mid-low back.  At Mercy Hospital, Mrs. Dunn was treated by neurologist Dr. Klein, who noted: "Her MRI scan is reviewed and shows virtually no change from her scan done in October of 2000."  (Def.'s Ex. 11 at 154.)  Mrs. Dunn reported that she was "reasonably comfortable" until "five days ago" when the charley horse sensation developed.  (Id.)  At Mercy Hospital, she received intensive pain treatment including epidural steroid injections.  Mrs. Dunn described the epidural steroid injections as "horrible."  (Day 1 Tr. (Docket # 24) 28.)  She feared that she was going to be paralyzed, and after the injections were administered she could not move her legs.  As a side effect of the injection therapy, Mrs. Dunn developed an intense post-epidural headache.  She received two blood patch procedures before relief was achieved.

After April 2003, Mrs. Dunn was unable to continue working.

**J.     Mrs. Dunn's Recent Treatment**

Over the past five years, Mrs. Dunn has continued to treat with various physicians for her pain. Mrs. Dunn has treated regularly with Dr. File throughout this time and continues to treat with him on at least a monthly basis. Dr. File indicated that Mrs. Dunn is a compliant patient.

Mrs. Dunn undergoes injection therapy consisting of approximately forty shorts of Botox with Dr. Seasholtz every three months. Mrs. Dunn stated that the shots were excruciating for her, both during the injection and after, but that the shots ultimately lead to some short term lessening of her pain. Mrs. Dunn also receives a steroid injection approximately every three months, which also provides some short term relief of her daily pain symptoms. Mrs. Dunn indicated that the steroid injections are painful and cause her legs to become numb, which prohibits her from walking for a few days following the injections. Mrs. Dunn engages in physical therapy and aqua therapy.

**K.     Mrs. Dunn's Life Before and After the 2002 Slip and Fall**

Before the slip and fall, Mrs. Dunn treated her pain with anti-inflammatory drugs, muscle relaxants and Percocet. Since the slip and fall, Mrs. Dunn has used increasingly potent narcotics to manage her pain, including a Morphine derivative, Opana. These drugs affect her mood, memory and general intellectual function. Since the slip and fall, Mrs. Dunn has begun using a cane to walk. Mrs. Dunn has begun taking anti-depressants since the slip and fall. She subscribes her depression to her physical condition.

Mrs. Dunn has not been able to work since April 2003. Before the slip and fall, Mrs. Dunn always worked, despite her condition. Mrs. Dunn is no longer active in her church community and no longer volunteers. She can no longer do household chores, and Mrs. Dunn's adult daughter provides full time care on a live-in basis.

**L.    Expert Testimony at Trial**

According to Dr. Conway,[3] the November 25, 2002 slip and fall did not cause Mrs. Dunn's chronic pain. Mrs. Dunn's complaints of pain are in so many different parts of her body that it is not reasonable to suppose that the 2002 slip and fall would be the cause, particularly since Mrs. Dunn's complaints differed over time. Dr. Conway noted that Mrs. Dunn complained of pain at different times at many sites, including the low back, the buttocks and radiating pain down the lower extremities (sometimes the left and sometimes the right). In the beginning, Mrs. Dunn complained of pain in the left lower extremity; later, she complained of pain in the right lower extremity. Mrs. Dunn also complained of pain in the cervical spine, the neck, shoulders, scapula as well as upper extremities and wrists.

Furthermore, when comparing objective diagnostic results with Mrs. Dunn's subjective complaints, some of her physicians found numbness in certain fingers that seemed to correlate with the complaints of pain, but the MRIs of the wrists showed no abnormality. MRIs were performed on the wrists because of the doctors' puzzlement over the inconsistencies, and the

---

[3]    Defendant's expert, Dr. Conway, is a Board Certified orthopedic surgeon. For 13 years, Dr. Conway was the chief of orthopedic surgery at North Shore Medical Center. He was the "founding father" of the Massachusetts Orthopedic Association, which represented the community of orthopedic surgeons in Massachusetts. Dr. Conway regularly reviews medical records. He has extensive experience evaluating patients to determine their diagnosis and with the use of diagnostic testing such as x-rays, CT scans, MRIs and nerve activity tests. Dr. Conway also has extensive experience comparing objective medical evidence with a patient's subjective complaints of pain and in determining whether medical treatment is helping a patient improve. Dr. Conway has previously been accepted as an expert in orthopedics, and no court has concluded that he was not an expert.

Dr. Conway reviewed Mrs. Dunn's medical records and deposition and prepared a lengthy report of his findings. He did not examine Mrs. Dunn. He concluded that it was unnecessary since Mrs. Dunn had been treated by more than 20 physicians, some of whom prepared excellent and detailed notes. Dr. Conway did not see any possibility that another examination would discover something different than identified by those who treated her. Dr. Conway provided his expert opinion to a reasonable degree of medical certainty. The Court credits the testimony and findings of Dr. Conway.

Plaintiff also offered Dr. File as an expert. Dr. File testified that on November 25, 2002, Mrs. Dunn suffered from a preexisting condition, which was exacerbated by the slip and fall in the Commissary. The exacerbation caused by the slip and fall resulted in increased hypersensitivity. Dr. File has also indicated that her current condition is at maximum medical improvement. According to Dr. File, the injury of November of 2002 has been a substantial causative factor in her permanent impairment.

results showed normal appearing bones and adequate volume to carpal tunnel. Mrs. Dunn's complaints of pain in other parts of the body also matched up poorly with the objective diagnostic tests. For example, examinations did not match up with either peripheral nerve distribution or distribution associated with the nerve root. Similarly, the doctors would find patchy areas where the pin-prick was not felt as well, but they did not conform to either the nerve root distribution or the distribution of a distal peripheral nerve. As a result it was difficult to tell where the pathology was located.

In addition, Dr. Conway noted that there was poor correlation; during one visit Mrs. Dunn would have a full range of motion but several weeks later she would have limited motion in the cervical spine, which was unusual. Dr. Conway opined that because Mrs. Dunn never received an accurate diagnosis, there was no way of discussing whether the treatment was successful.[4] Dr. Conway also noted that Mrs. Dunn was a prodigious user of medical services. Mrs. Dunn would specifically ask for MRI studies that the doctors had not included in their plans; she requested trigger point injections; she coached the medical care providers.

Dr. Conway concluded that the slip and fall did not result in any anatomical change that could account for Mrs. Dunn's complaints of pain.[5] Mrs. Dunn's treating physicians did not find

---

[4] Dr. File, an Osteopath, testified that somatic dysfunction is a specific diagnosis, and that he had objective findings of the somatic dysfunction. Somatic dysfunction is listed as a specific diagnosis in the ICD-9 code book, which is a generally accepted code book, at 739.0-9. Nonetheless, in October of 2000, Dr. File's diagnosis was somatic dysfunction; Dr. File's diagnosis was the same after the 2002 slip and fall. Dr. Conway indicated that the diagnosis that Mrs. Dunn suffered from "somatic dysfunction" does not reveal a great deal because "somatic dysfunction" simply refers to an abnormal functioning of the body and is a non-specific diagnosis.

[5] While degenerative disc disease at L4-L5 was a legitimate diagnosis for Mrs. Dunn, the five MRIs taken showed no change between the year 2000, before the slip and fall, and the MRI taken shortly after the incident in 2002. For example, a comparison of Mrs. Dunn's 2000 MRI and her April 2003 MRI revealed no change. Herniation at L4-L5 was first seen as a result of Mrs. Dunn's fifth MRI.

Dr. Conway admitted that an MRI would not show tightening of the muscle or a spasm of the muscle. Dr. Conway also admitted that it is possible for a person to have extensive physical problems that cannot be picked up in diagnostic studies, but he also indicated that together with physical examination, a good history and a good follow-up, a physician should be able to come to an answer.

any nerve root compression. Nor did any of her treating physicians find any atrophy of the muscles. As a result, there was no indication of primary muscle disease or difficulty with a nerve that supports a particular muscle. It is not medically possible for a slip and fall without anatomical changes, as described in this case, to blossom into whole body pain of the kind complained of by Mrs. Dunn. Mrs. Dunn experienced an exacerbation, but it was a very transient and temporary event.

## II. CONCLUSIONS OF LAW

The Court must now determine whether Plaintiff has proven her case for negligence.

### 1. Negligence

Under Maine law, Defendant owed Plaintiff "the positive duty of exercising reasonable care in providing reasonably safe premises for their use." Poulin v. Colby College, 402 A.2d 846, 848 (Me. 1979); see also Marcoux v. Parker Hannifin/Nichols Portland Division, 881 A.2d 1138, 1145 n.4 (Me. 2005).

> When a foreign substance on the floor causes a member of the public to sustain injuries, the injured party ordinarily bears the burden of proving the defendant's negligence by establishing (1) that the defendant caused the substance to be there, or (2) that the defendant had actual knowledge of the existence of the foreign substance, or (3) that the foreign substance was on the floor for such a length of time that the defendant should have known about it.

Milliken v. Lewiston, 580 A.2d 151, 152 (Me. 1990). A plaintiff need not prove actual notice, however, "if the plaintiff can establish that the store owner was aware of the risk of a recurrence of a hazardous condition of the premises." Dumont v. Shaw's Supermarkets, Inc., 664 A.2d 846, 848 (Me. 1995).

Plaintiff has established by a preponderance of the evidence that the Defendant breached its duty to provide a reasonably safe premises. First, Defendant caused the water to be on the floor. Shortly after accident, Mr. Jones acknowledged that the puddle was on the floor because a

Commissary employee had sprayed the produce with water. When Mrs. Dunn fell, there were no mats on the floor to prevent such an accident and no signs to warn individuals as to the potential danger. Furthermore, the Court finds that the employees of the Commissary either knew or should have known about the water on the floor. Not only did Mr. Jones determine that the water was the result of the actions of a Commissary employee, but after the incident, Mr. Jones made a poster calling to the attention of all produce personnel the importance of not leaving water on the floor after watering the vegetables, and if the floor did become wet, to post the area with a sign until the floor was dry.[6] The subsequent measure of alerting employees to this potential hazard establishes that the Commissary should have known of the danger and alerted invitees to the potential hazard. The Court next turns to the issues of causation and damages.

A plaintiff in a negligence action must "establish a causal relationship between the injury that is the subject of the lawsuit and the alleged consequences of that injury." Lovely v. Allstate Insurance Co., 658 A.2d 1091, 1094 (Me. 1995) (Lipez, J., concurring). Plaintiff alleges that she had a pre-existing condition that made her more susceptible to injury and that Defendant is responsible for all injuries or loses suffered by Plaintiff as a result of Defendant's negligence. Defendant contends that Plaintiff has failed to establish causation and, in the alternative, that any exacerbation of a pre-existing injury was transient.

Under Maine law, where "a negligent actor, by aggravating a preexisting injury, produces an aggregate injury that is incapable of apportionment," the defendant is liable for the entire amount of the damages. Lovely, 658 A.2d at 1092. Thus, where a defendant claims that a plaintiff's damages are due in whole or in part to a preexisting injury, "the burden shifts to the

---

[6] Federal Rule of Evidence 407 provides: "When, after an injury or harm allegedly caused by an event, measures are taken that, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence, culpable conduct, a defect in a product, a defect in a product's design, or a need for a warning or instruction." Nonetheless, Defendant failed to object to the admission of this evidence and, therefore, it will be considered by the Court.

15

defendant to prove by a preponderance of the evidence that the other condition or factor caused the plaintiff's damages in whole or in part." Merrill v. Sugarloaf Mountain Corp., 745 A.2d 378, 385 (Me. 2000). This rule "places any hardship resulting from the difficulty of apportionment on the proven wrongdoer and not on the innocent plaintiff." Lovely, 658 A.2d at 1093.

      The Court finds that Defendant's negligence did cause Plaintiff to experience pain and suffering immediately following the 2002 slip and fall. Nonetheless, the Court also finds that the pain and suffering attributable to the slip and fall was transient. Defendant has carried its burden to show by a preponderance of the evidence that the 2002 slip and fall did not cause Plaintiff's chronic pain and suffering. Rather, the record before the Court shows that while the 2002 slip and fall did cause Plaintiff temporary pain, it is not medically possible for the 2002 slip and fall to blossom into the whole body pain complained of by Mrs. Dunn without anatomical changes. In making this determination, the Court has reviewed Plaintiff's extensive medical records and credits the testimony of Dr. Conway to the extent the various experts in this case have offered diverging opinions. Defendant's liability for the 2002 slip and fall ended when Plaintiff returned to work on January 21, 2003. Accordingly, the Court awards Plaintiff damages in the amount of $ 30,000 for her pain and suffering and loss of enjoyment of life immediately following the 2002 slip and fall. The Court finds that there is no permanent impairment resulting from this accident.

      **SO ORDERED.**

                    /s/ George Z. Singal
                    Chief United States District Judge

Dated this 1st day of August, 2008.